[Crim. No. 752.    Third Appellate District.—April 29, 1924.]

## THE PEOPLE, Respondent, v. W. H. WRIGHT et al., Appellants.

[1] CRIMINAL LAW—CRIMINAL SYNDICALISM—CHARACTER OF I. W. W. —EVIDENCE.—In this prosecution for a violation of the Criminal Syndicalism Act, the evidence introduced by the prosecution was sufficient to justify the verdict of guilty; and the testimony introduced by the defendants for the purpose of proving that the I. W. W. did not advocate crime or acts of violence in the carrying out of its principles, that the leaders had often advised against criminal acts or violence of any character in the pressing of the principles of the organization upon the people, and that the organization, after the passage of the syndicalism law, adopted a resolution declaring that the organization "does not now and never has believed in or advocated either destruction or violence as a means of encompassing industrial reform," merely had the effect of creating a conflict in the evidence which it was the duty of the jury to determine.

[2] ID.—REMOTE ACTS OF VIOLENCE—WEIGHT OF EVIDENCE.—In such a prosecution, the objection, on the ground of remoteness, to proof of criminal acts shown to have been done several years prior to the date of trial and prior to the arrest of the defendants goes to the weight of the testimony, rather than

---

1. Validity of legislation directed against social or industrial propaganda deemed to be of a dangerous tendency, notes, 1 A. L. R. 336; 20 A. L. R. 1543. See, also, 5 Cal. Jur. 506; 5 R. C. L. 1074.

2. See 10 Cal. Jur. 808, 1140.

to its competency; and such evidence is properly received, particularly where it is also shown that, while the I. W. W. after the passage of the syndicalism law proclaimed itself as against the commission of crime or acts of sabotage or other violence, such proclamation was wholly a subterfuge, and that the organization still advocated and urged the commission of crime and acts of sabotage as a means of accomplishing its purpose.

[3] ID.—PUBLICATION OF SATIRICAL ARTICLE—EVIDENCE.—In such a prosecution, the error, if any, in admitting in evidence a satirical article published in one of the official newspapers of the I. W. W. concerning the passing of the late President Harding, and which was aimed, not particularly at the late President as an individual, but as a political system established for the orderly government of society, was without prejudice in view of the strong case made against the accused.

[4] ID.—TEACHING OF UNLAWFUL ACTS—PROOF OF COMMISSION.—The act of teaching, or advocating or aiding and abetting the commission of crime, sabotage or unlawful acts of force and violence, or unlawful methods of terrorism, as a means of accomplishing a change in industrial ownership or control, or affecting any political change, by an organization or assemblage of persons, constitutes criminal syndicalism; and the actual acts of violence or the actual commission of crime are merely evidentiary and tend to show the character of the organization and the fact that it does teach and advocate such methods.

[5] ID.—SUFFICIENCY OF INSTRUCTIONS GIVEN.—In this prosecution for a violation of the Criminal Syndicalism Act, the charge of the court having covered every principle of law applicable to the case and been expressed in lucid language, and the court, in its charge, in defining criminal syndicalism, having not only set forth section 1 of the act, but also given an instruction clearly and positively stating that in order to convict the defendants the jury must find that the defendants and each of them "did discover and know that the organization referred to as the I. W. W. was an organization for the purpose of advocating, teaching, aiding and abetting criminal syndicalism," there was no error in disallowing certain instructions preferred by the defendants.

(1) 33 C. J., p. 165, sec. 25.    (2) 33 C. J., p. 165, sec. 25.    (3) 17 C. J., p. 321, sec. 3663.    (4) 33 C. J., p. 163, sec. 18 (1926 Anno.).    (5) 16 C. J., p. 1063, sec. 2506.

APPEAL from a judgment of the Superior Court of Plumas County and from an order denying a new trial. J. O. Moncur, Judge.    Affirmed.

5.    See 2 Cal. Jur. 1026; 2 R. C. L. 261.

The facts are stated in the opinion of the court.

Austin Lewis for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants above named were jointly charged, by information, filed in the superior court of Plumas County, with the crime of "criminal syndicalism," as that crime is defined by an act of the legislature of 1919, entitled "An Act Defining Criminal Syndicalism and Sabotage, proscribing certain acts and methods in connection therewith, and in pursuance thereof, and providing penalties and punishments therefor." (Stats. 1919, p. 281 ) The defendants were jointly tried for the offense so charged and all, with the exception of the defendant Williams, who was acquitted, were found guilty by the jury. A separate verdict was found and returned as to each of the defendants. A motion for a new trial was made in behalf of each of the convicted defendants and denied and each appeals from the judgment of conviction and the order denying him a new trial.

Subdivision 4 of section 2 of the Criminal Syndicalism Act constitutes the basis of the charge alleged in the information. That section provides:

"Any person who organizes, or assists in organizing, or is or knowingly becomes a member of any organization, society, group or assemblage of persons organized or assembled to advocate, teach, or aid and abet criminal syndicalism," is guilty of a felony, etc.

Section 1 of said act thus defines "criminal syndicalism," as said phrase is used therein:

"Any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to physical property) or unlawful acts of force and violence or unlawful methods or terrorism, as a means of accomplishing a change in industrial ownership or control, or affecting any political change."

The points made by the appellants on this appeal are numerous, the general import thereof being that the evidence

does not support the verdicts, that irrelevant and incompetent testimony was allowed to go before the jury, and that error was committed by the giving of certain instructions and the refusal to give others, the latter having been proposed by the appellants.

The defendants, with the exception of Wright and Bamman, were arrested by the sheriff of Plumas County in a raid on a house in Portola, said county, on the fourteenth day of July, 1923. Suspended from the front of the house was a sign about three feet long and eight inches wide, containing the words "I. W. W. Office." On the windows were smaller signs containing the same words. Each of the defendants found in the house at the time the raid was made was searched by the sheriff and found to have in his possession a membership card of the I. W. W. The defendant Bamman was out on the street at the time the raid was made, but practically surrendered himself to that officer by stepping up to him and delivering to him his membership card. Wright was arrested in Quincy, the county seat, and upon his person was also found a membership card. These cards were introduced in evidence for the purpose of showing that the defendants were members of the I. W. W. organization. There is not and could not be any question raised here as to the fact that the defendants were members of the organization, because they admitted at the trial that they were such members. The sheriff found and took possession of a large quantity of I. W. W. literature and this was introduced in evidence. There is no necessity for detailing or reciting in substance herein the testimony introduced by the people to support the charge against the accused. Elbert Coutts and W. E. Townsend, former members of the I. W. W. and whose testimony has been received in every criminal syndicalism case which this court has been called upon to review in the past three or four years, testified in the instant case, going over practically the same ground that they had at previous trials. Joe Arada, another witness whose testimony has appeared in previous cases and to which reference has been made in the opinions filed in this court in said cases, was also a witness in the present case and gave the same testimony that he had theretofore. G. J. Davis, deputy sheriff of Stanislaus County in the years 1917 and 1918, who has also

66 Cal. App.—50

testified in one or two previous cases reviewed by this court, testified to the incendiary fires which occurred in that county and in the city of Modesto in the year 1917, and which were supposed to have been caused by certain members of the I. W. W. The attorney for the defendants in the present case made no objection at any time at the trial to the testimony of Townsend, Coutts, Arada and Davis. Coutts told the story of his connection with the I. W. W. from 1912 until and including a portion of the year 1918, he having joined the organization when he was but sixteen years of age. He repeated the story of the making, by himself and other members of the I. W. W., of different chemical combinations and explosives on a houseboat on Smith's slough, about three miles south of the city of Stockton, in the year 1917, and reiterated that such chemicals and explosives were made for the purpose of carrying on the destructive policy of the I. W. W. in its efforts to establish an industrial government in this country in place of our present system. He also told the story of his connection with other members of the I. W. W. in the setting of fires and thereby the destruction of a number of haystacks in Stanislaus County in the month of June, 1917, and also the like destruction of a stable, garage and a large quantity of hay in the city of Modesto in the month of October of that year. He also testified that at the meetings of the I. W. W. the use of violence and the commission of crimes as the means for terrorizing the people into submission to the political vagaries and revolutionary notions of the I. W. W. were matters of common discussion and advocacy. Townsend, as stated, gave a statement of the principles and purposes of the I. W. W. and the determination of that organization to carry out its plans by means of acts of sabotage and other crimes. Arada testified that he was employed in August, 1917, on McDonald Island, about fifteen miles south of Stockton, by the Scata Company, being engaged in the digging of potatoes. There was a large number of other laborers employed in the same work. The men slept in one large room in what was known as the bunkhouse on the ranch. A few days after these men were so engaged some fourteen other men called at the place and asked for employment. The owner of the property gave them employment and they worked all of the afternoon

of the day they made their appearance there and at night slept in the large room so occupied by the other workmen. The next morning the fourteen men referred to left the premises without obtaining breakfast or demanding or receiving compensation for their labor the day before. Arada, a short time before noon of that day, and while employed in the field, felt a burning sensation in his feet. The pain grew in intensity until he was required to remove his shoes, and, upon doing so, he found that his feet were seriously blistered and also discovered what appeared to be white powder in his shoes. The white powder proved to be potassium hydroxide, which, so testified an expert chemist, will destroy "organic matter or human flesh" and would cause one's feet, if brought in contact with them, to bleed and would cause much pain and suffering. The story, as he told it herein, of the severity of his injuries and how he was compelled to go to the county hospital for treatment, where he remained over a year before he was able to use his feet, is told in the case of *People* v. *Roe*, 58 Cal. App. 695 [209 Pac. 381]. He further testified that I. W. W. papers were found in the bunkhouse the morning the fourteen men referred to left the premises and stated that no such literature had been seen there before. Davis, the deputy sheriff above referred to, told about the fires in Stanislaus County on the morning of July 21, 1917. He stated that some eight or nine haystacks a short distance from Modesto and within a radius of a few miles of each other, belonging to different persons, were found to be burning simultaneously. He also testified as to the incendiary fires resulting in the destruction of the buildings in the city of Modesto, and above referred to, and stated that these several fires were in progress at about the same time. The people introduced in evidence a large amount of literature of the same general character as that introduced and referred to in the cases of *People* v. *Taylor*, 187 Cal. 378 [203 Pac. 85]; *People* v. *Roe*, 58 Cal. App. 690 [209 Pac. 381]; *People* v. *Flanagan et al.*, 65 Cal. App. 268 [223 Pac. 1014]; *People* v. *Wagner*, 65 Cal. App. 704 [225 Pac. 464]. Some of this literature involved publications under the authority of the I. W. W. organization, which openly advocated the resort to crimes and acts of violence for the purpose of carrying out the ultimate plans of said organization. Much of this

constituted publications appearing prior to the enactment of the syndicalism law. But Townsend testified that the same propaganda of violence and crime was advocated by the organization at their meetings and in divers other places long after the syndicalism act was placed upon the statute books. For illustration, a songbook, published under the authority of the I. W. W. in the year 1918, and containing a number of different so-called songs which involved somewhat veiled yet plainly apparent suggestions of the necessity for pursuing a course of criminal violence to accomplish the main purposes of the organization, was introduced in evidence. It was claimed at the trial that this book had been supplanted by a new songbook from which the objectionable songs referred to had been eliminated after the passage of the Syndicalism Act. But Townsend stated that, notwithstanding that the objectionable songs were not contained in the new book, they were, nevertheless, still sung at the meetings of the I. W. W. and at other places when there was a considerable number of them together. But, as stated above, there is no necessity for setting forth herein even in substance the vast amount of literature that was introduced by the people in support of the charge. It is enough to say that all of this literature, as was shown in the cases heretofore decided by this and the supreme court, contained incendiary utterances against our government and society generally as it is governed to-day.

[1] Some of the defendants and other witnesses, members of the I. W. W., testifying for the defense, declared that the organization never did advocate the commission of crime or acts of violence in the carrying out of its principles. Some of these witnesses testified that they never heard at any I. W. W. meeting any suggestion that acts of violence should be resorted to for any purpose connected with the organization, but, to the contrary, the leaders thereof had often advised against criminal acts or violence of any character in the pressing of the principles of the organization upon the people. A resolution adopted by the I. W. W. organization, after the passage of the syndicalism law, declaring that the Industrial Workers of the World "do hereby declare that said organization does not now and never has believed in or advocated either destruction or violence as a means of encompassing industrial reform," was

introduced by the defense. Several other similar statements published under the authority of the organization were also introduced in evidence.

The testimony thus presented by the defendants merely had the effect of creating a conflict in the evidence which it was the duty of the jury to determine.

[2] The counsel for the defendants insists that the testimony presented by the people disclosing acts of violence in the years 1917, 1918 and 1919 "was too remote" and for that reason should not have been received. While it is true the criminal acts shown to have been done in the years mentioned were rather remote from the date of the trial, yet the objection on the ground of remoteness goes to the weight of the testimony rather than to its competency. Besides, Townsend, as we have seen, testified that, while it was true the organization after the enactment of the criminal syndicalism law proclaimed itself as against the commission of crime or acts of sabotage or other acts of violence, such proclamation or the resolution containing such proclamation was wholly a subterfuge and intended for the sole purpose of hoodwinking the public into the belief that the organization had in good faith changed its tactics in that particular; that after the resolution referred to was adopted the members still advocated and urged the commission of acts of violence and sabotage as they had prior to the enactment of the criminal syndicalism law. Indeed, the jury could well have doubted the sincerity of the organization in the adoption of the resolution denouncing violence of any character as a means "for encompassing industrial reform" upon comparing the statement therein contained that said organization "does not *now and never has believed* in or advocated either destruction or violence" with the vast amount of testimony brought before them which showed that, as a matter of fact, the organization or its members had committed the most atrocious crimes for the purpose of terrorizing the people in the futile hope that it would intimidate them into yielding to the demands of the organization.

There are a number of assignments involving objections to said literature that was offered and received in evidence. We have examined these assignments and find that, generally speaking, they are without legal force. Those errors in rulings upon the evidence which might be subject to a

degree of criticism, in view of the strong case made against the accused, were without prejudice. [3] The ruling admitting in evidence a contemptuously satirical article published in one of the official newspapers of the I. W. W. concerning the passing of the late President Harding is specially complained of, the contention being that the article was irrelevant and incompetent as evidence and tended strongly to prejudice the defendants in the minds of the jury. The article was aimed, not particularly at the late President as an individual, but at a political system established for the orderly government of society. In other words, the attack contained in the publication was an attack upon our political system and institutions. While it was not necessary to introduce the article in evidence in this case, yet there was nothing in the article any more radical than statements contained in other newspapers, magazines and pamphlets admittedly published by and under the authority of the organization and which were properly received in evidence as in proof of the general attitude of the organization toward the government of this country, and, indeed, toward all constituted authority, whether involving democratic, aristocratic or other rational forms and systems of government.

[4] The statement of counsel for the defendants that, to constitute criminal syndicalism, "there must not only be acts of violence committed, but those acts of violence must be employed with the direct purpose of effecting the political or industrial changes named in the statute" does not altogether involve a correct view of the law. The law, as will be observed, provides that the act of teaching or advocating or aiding and abetting the commission of crime, sabotage or unlawful acts of force and violence, or unlawful methods of terrorism, as a means of accomplishing a change in industrial ownership or control, or effecting any political change, by any organization or assemblage of persons, constitutes criminal syndicalism. It will thus be noted that the mere teaching, etc., is sufficient and that the actual acts of violence or the actual commission of crime are merely evidentiary and tend to show the character of the organization and the fact that it does teach and advocate such methods.

[5] The objection is made that the court erred in refusing to give certain instructions preferred by the de-

fendants. We think that there was no error in disallowing said instructions. The charge of the court covers every principle of law applicable to the case and was expressed in lucid language. In this connection, it may be observed that the court, in its charge, in defining criminal syndicalism, not only set forth section 1 of the act, but also gave an instruction clearly and positively stating that in order to convict the defendants the jury must find that the defendants and each of them "did discover and know that the organization referred to as the I. W. W. was an organization for the purpose of advocating, teaching, aiding and abetting criminal syndicalism."

The judgment and the order as to each of the appealing defendants are affirmed.

Plummer, J., and Finch, P. J., concurred.