UNITED STATES v. PETRONE.

No. 49, Docket 21733.

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1950.

Decided Nov. 20, 1950.

Writ of Certiorari Denied Feb. 26, 1951.

Arthur N. Field, New York City, Anthony A. Calandra, Newark, N. J., J. Vincent Keogh, Brooklyn, N. Y. (Henry Epstein, New York City, of counsel), for appellant.

Roy M. Cohn, New York City, Irving H. Saypol, U. S. Atty., New York City (Bruno Schachner, James B. Kilsheimer, III, Asst. U. S. Attys., New York City, of counsel), for the United States.

Before LEARNED HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

PER CURIAM.

This is an appeal from a judgment entered upon the findings of the judge—after waiver of a jury—convicting Petrone, the appellant, of possessing "approximately" 500 counterfeit $10 bills with intent to defraud.[1] The points raised are two: (1) that the evidence did not support the findings and (2) that the judge refused to allow a question put to one of the prosecution's witnesses on cross-examination. The substance of the evidence was as follows.

Three agents of the Federal Bureau of Investigation procured a warrant for the arrest of Petrone on a charge of receiving stolen goods which were being transported in interstate commerce. Petrone admitted the agents to his house in the Borough of the Bronx in New York City, where they arrested him, and in his company and that of his wife began with his consent to search the premises. On the third floor there were three bedrooms, in one of which one of the agents found a bundle of 510 counterfeit $10 bills lying in the open on top of a dresser. The agent took possession of the bundle and asked Petrone whether the bills were not counterfeit, to which he answered: "Cannot we do something about this?"; adding that he was disgusted with himself that the counterfeits should be found in his possession. In answer to another agent, he declared that he was not going to burn them, but that he was not going to pass them in New York or in Canada; and he explained that they had been brought in the night before by a "rat," whose name he refused to disclose because he "was no stool pigeon." Counterfeit money, he said, was not in his "line," although "he had never seen any that looked any better."

Petrone does not suggest any tenable explanation for the presence of the bills in his house without his knowledge. If he did not himself put them where they were found, someone else must have done so in that most unlikely spot; for, if the bearer gave them to Petrone in another part of the house, and Petrone carried them to the bedroom, by so doing he came into possession of them. A faintly plausible alternative would be that the "rat," whoever he was, without Petrone's connivance left the bills in the bedroom and then went away without telling Petrone what he had done. Quite aside from the incriminating comments which he made at the time, it cannot be seriously argued that the judge ought to have thought such an explanation as within the reasonable possibilities. If the "rat," finding himself in the possession of such incriminating goods,

wished to be rid of them, it is absurd to suppose that he would have chosen this way of escape. Furthermore, once we suppose that Petrone was in possession of the money, his intent to use it fraudulently follows. Such bills have no honest use except when they are in the possession of public authorities, as evidence or the like. One might discover that a single bill, or conceivably two or three, had been passed upon one, and perhaps one might keep them without intent to defraud, though even that is doubtful; but nobody in possession of $5100 counterfeit money innocently keeps it; its possession is to the last degree perilous, and the possessor, if honest, will either destroy it straightway or turn it over to the authorities. Petrone gave no explanation of what he meant to do with them, except that he did not mean to pass them in New York or Canada, which at least suggested that he planned to pass them elsewhere. The findings were not only based upon adequate evidence, but no other conclusion was possible to any intelligent judge.

 The other alleged error rose as follows. During the cross examination of one of the agents Petrone's counsel asked whether Petrone had not given "the impression * * * that he did not know those bills were in that room," and the judge sustained the objection on the ground that that was a question for him to decide. We infer that he supposed that, since the question called for the witness's "conclusion" about Petrone's appearance, it was incompetent. There is, of course, a spate of decisions upon that question, of which the earlier often set up such a canon as peremptory and at times even treated its violation as a ground for reversal. In this circuit we have several times taken another view[2]: that is, that the question is at most one of discretion, turning upon how the judge thinks the truth may best be extracted from the particular witness who chances to be on the stand. Made obligatory, not only may the canon become a substantial obstacle to developing the truth, but it presupposes a logical solecism; for our perceptions—even our most immediate sense perceptions—are always "conclusions." The question ought always to be whether it is more convenient to insist that the witness disentangle in his own mind—which, much more often than not, he is quite unable to do—those constituent factors on which his opinion is based; or to let him state his opinion and leave to cross examination a searching inquisition to uncover its foundations. Yet such is the inveterate habit in American courts of treating rules of evidence as though they were sacred tables, that it is apparently impossible to substitute the view that they should be lightly held as wise admonitions for the general conduct of the trial. We do not forget that that attitude is not possible as to all—e.g., as to hearsay —but in this instance it was, not only possible, but required. Nothing is less within the powers of the ordinary witness than to analyze the agglomerate of sensations which combine in his mind to give him an "impression" of the contents of another's mind. To require him to unravel that nexus will, unless he is much practised in self scrutiny, generally make him substitute an utterly unreal—though honest—set of constituents, or will altogether paralyze his powers of expression. Nor is it in the least an objection—as apparently the judge here supposed—that the opinion is upon a crucial issue. However, in the case at bar, the error, though error it was, would not warrant our reversing a conviction so plainly demanded by the evidence, even had Petrone objected to the ruling, as in fact he did not.

Judgment affirmed.

2. Central Railroad of New Jersey v. Monahan, 11 F.2d 212, 214. Farish Company v. Madison Distributing Co., 37 F.2d 455, 459. United States v. Cotter, 60 F.2d 689, 693, 694. United States v. Fried, 149 F.2d 1011, 1013 (semble). United States v. Krulewitch, 167 F.2d 943, 948. See also Zimberg v. United States, 1 Cir., 142 F.2d 132, 135. Wigmore on Evidence (3rd ed.), § 1929.